### UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

WM CAPITAL PARTNERS I, LLC,

       Plaintiff,

                               Case No. 10-10359

v.                            Hon. Gerald E. Rosen

BBJ MORTGAGE SERVICES, INC.,
WATSON GROUP FINANCIAL CORPORATION,
JEFFREY M. McGEE, JEFFREY M. McGEE
TRUST, BRIAN A. SEIBERT, and BRIAN A.
SEIBERT TRUST,

       Defendants.
_____/

### OPINION AND ORDER REGARDING
### PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

At a session of said Court, held in
the U.S. Courthouse, Detroit, Michigan
on _____ March 28, 2011 _____

PRESENT:  Honorable Gerald E. Rosen
                Chief Judge, United States District Court

## I.  INTRODUCTION

Plaintiff WM Capital Partners I, LLC commenced this action in this Court on

January 26, 2010, seeking to recover under a promissory note and related loan documents

through which the several Defendants allegedly obligated themselves to pay back a $1.3

million loan made by Plaintiff's predecessor-in-interest, Michigan Heritage Bank.  In

support of this effort, Plaintiff has asserted eight claims in its first amended complaint,

alleging that Defendants have breached the promissory note, a number of individual

guaranties, and a loan-related agreement, that they failed to hold certain proceeds in an express trust as required under the loan documents, and that they committed the tort of conversion by exercising wrongful control over these proceeds.[1]  The Court's subject matter jurisdiction over this suit rests upon the diverse citizenship of the parties.  *See* 28 U.S.C. § 1332(a).

Through the present motion filed on July 30, 2010, Plaintiff now seeks summary judgment in its favor on each of the eight counts of its first amended complaint.  In essence, Plaintiff argues that there is no dispute as to Defendants' obligations under the note and related loan documents or as to Defendants' breaches of these obligations, and that the defenses advanced by Defendants would, at best, merely reduce the amount of damages to which Plaintiff would be entitled under its various theories of recovery.  On August 17, 2010, Defendants filed a response in opposition to Plaintiff's motion, and Plaintiff, in turn, has filed an August 31, 2010 reply brief in further support of its motion.

Having reviewed the parties' briefs in support of and opposition to Plaintiff's motion, as well as the accompanying exhibits and the remainder of the record, the Court finds that the relevant allegations, facts, and legal arguments are adequately presented in these written submissions, and that oral argument would not aid the decisional process.  Accordingly, the Court will decide Plaintiff's motion "on the briefs."  *See* Local Rule 7.1(f)(2), U.S. District Court, Eastern District of Michigan.  This opinion and order sets

---

[1]Plaintiff asserted additional claims in its initial complaint, but these claims were dropped from its first amended complaint, and no longer are at issue in this case.

2

forth the Court's rulings on this motion.

## II.  <u>FACTUAL BACKGROUND</u>

**A.    The Loan Documents Executed by Defendants in Connection with a Loan Obtained from Non-Party Michigan Heritage Bank, and the Actions Taken by Defendants and the Bank During Their Lending Relationship**

Defendants Watson Group Financial Corporation ("Watson") and BBJ Mortgage Services, Inc. ("BBJ") are in the business of originating and servicing mortgage loans.[2] Both companies are owed by Defendants Jeffrey M. McGee and Brian A. Seibert.

On September 18, 2008, Watson and BBJ entered into a loan agreement with Michigan Heritage Bank, in which the bank agreed to advance up to $2 million to these businesses.  (*See* Plaintiff's Motion, Ex. C, Business Loan Agreement.)  As part of the loan transaction, Watson and BBJ, through their corporate officers McGee and Seibert, executed a promissory note (the "Note") in which they promised to pay the principal balance of the loan plus all accrued unpaid interest on or before September 18, 2009. (*See* Plaintiff's Motion, Ex. B, Promissory Note at 1.)  Watson and BBJ then took an initial advance of approximately $1.1 million under this loan arrangement, with these funds used to repay a debt owed to Independence Bank.

Apart from the Note, Michigan Heritage required that Defendants execute a number of other documents establishing the terms of their lending relationship.  First, Defendants McGee and Seibert executed guaranties, both on their own behalf and on

---

[2]Watson is a mortgage originator, and BBJ then services the mortgages originated by Watson.

behalf of the two Defendant Trusts, in which they promised to fulfill the obligations of borrowers Watson and BBJ in the event of a default in the repayment of the loan. (*See* Plaintiff's Motion, Ex. G, Guaranties.) The borrowers also granted the bank a security interest in, among other things, a pool of specifically identified residential mortgages (the "Collateral Mortgages") that had been originated or were being serviced by Watson or BBJ . (*See* Plaintiff's Motion, Ex. D, Commercial Security Agreement; *see also* Plaintiff's Motion, Ex. E, Borrowing Base Certificates (identifying specific mortgages in the pool of Collateral Mortgages).) Under this security agreement, Michigan Heritage also was granted a security interest "in all proceeds . . . from the sale, destruction, loss, or other disposition" of the Collateral Mortgages, and, in the event of a default, the bank was granted "full power to sell, lease, transfer, or otherwise deal with the Collateral or proceeds thereof," and to collect the payments, rents, income, and revenues from the Collateral." (Commercial Security Agreement at 1, 3.)

In addition, the bank and borrowers Watson and BBJ executed a "Mortgage Warehousing and Security Agreement" (the "Warehousing Agreement"), which set forth the terms under which Michigan Heritage would "establish a revolving line of credit in favor of" Watson and BBJ and these two borrowers, in turn, would "warehouse certain mortgage loans . . . with [the bank] pending the sale of" these loans. (Plaintiff's Motion, Ex. H, Warehousing Agreement at 1.) As to the "Collateral Mortgage Loans" warehoused under this agreement, Watson and BBJ agreed that all "[p]roceeds received from sales or other dispositions of Collateral Mortgage Loans shall be applied to repay

4

any outstanding Advances," and that, in the event of default, "all cash, proceeds, and instruments received by [Watson or BBJ] . . . as a result of the sale or other disposition of the Collateral . . . shall be remitted to [the bank or its designate] in the form received . . . not later than the Business Day following the day of receipt."  (Warehousing Agreement at §§ 1.3(iii), 6.3(ii).)  This agreement also empowered the bank, upon the borrowers' default, to "notify . . the mortgagor(s) under any Collateral Mortgage Loan . . . to make payments and deliver other monies . . . directly to" the bank.  (*Id.* at § 6.3(i)(d).)  The agreement further conferred upon Michigan Heritage the "sole discretion" whether to make advances to the borrowers, but stated that the bank was under no obligation to make any such advances.  (*Id.* at § 1.7(ii).)[3]

Finally, the Warehousing Agreement included a formula for determining the maximum amount Watson and BBJ could borrow under their arrangement with Michigan Heritage.  Specifically, the outstanding principal balance of all advances given by the bank could not exceed 70 percent of the total value of the specific mortgages identified as within the pool of Collateral Mortgages.  (*See id.* at § 1.8(i)(d), (ii).)  Defendants state that Watson and BBJ never borrowed in excess of this 70-percent formula.  Defendants further assert that, while the Warehousing Agreement purportedly contemplated an arrangement under which Watson and BBJ would request periodic advances as a source

---

[3]Both the Commercial Security Agreement and the Warehousing Agreement included integration clauses, as well as provisions requiring that any amendments be agreed to in writing by the bank.  These agreements also included provisions stating that the bank's failure to act in conformity with the loan documents or to exercise a right conferred under these documents did not constitute a waiver of the lender's contractual rights.

of interim funding for forthcoming mortgage loan transactions, the two companies never used the agreement for this purpose, and the agreement's procedures for seeking such advances were never followed.  Rather, Defendants contend that they treated the arrangement with Michigan Heritage as a conventional line-of-credit agreement, under which Watson and BBJ pledged "already existing, serviced loans" as collateral for disbursements sought from and made by the bank, (Defendants' Response Br. at 3-4) — including, for example, the initial disbursement of approximately $1.1 million used to pay off the companies' debt to Independence Bank.

During the course of the lending relationship with Michigan Heritage, Defendants state that mortgages were added to and removed from the pool of Collateral Mortgages used to secure the loan.  Defendants assert (albeit without citation to the record) that "[t]hese modifications to the collateral were made with the full knowledge and consent of Michigan Heritage Bank."  (Defendants' Response Br. at 5.)  Defendants further assert that although they remained at all times within the 70-percent formula set forth in the Warehousing Agreement, Michigan Heritage nonetheless refused BBJ's request for an advance in March of 2009, which Defendants view as a breach of the loan agreement.

**B.**     **Plaintiff's Acquisition of Michigan Heritage Bank's Rights Under the Loan Documents, and Its Efforts to Collect the Outstanding Loan Balance and Secure Its Collateral**

In the spring of 2009, Michigan Heritage Bank was shut down by Michigan's Office of Financial and Insurance Regulation, and the Federal Deposit Insurance Corporation ("FDIC") was named as receiver. The bank's loan portfolio was made available for purchase through auction, and Plaintiff WM Capital Partners I, LLC purchased Defendants' Note in October of 2009. All are agreed that, as a result of this transaction, Plaintiff now stands in the shoes of Michigan Heritage Bank, acquiring all the rights conferred upon the bank under the loan documents, and subject to all obligations owed by (and conditions imposed upon) the bank under these documents.

On September 18, 2009, the Note executed by Defendants Watson and BBJ matured. When these parties failed to pay the outstanding principal balance — which both sides agree is approximately $1.3 million  — Plaintiff sent Defendants an October 26, 2009 letter stating that the loan was in default and that the full amount (plus accrued interest and late fees) was due. (*See* Plaintiff's Motion, Ex. J.)[4] Plaintiff also took a

---

[4]Apart from this "event of default" under the loan documents arising from Defendants' failure to pay the outstanding loan balance upon the maturity of the Note, Plaintiff contends that Defendants had previously triggered a default under the loan documents by selling or otherwise disposing of at least two mortgages in the pool of Collateral Mortgages without paying the proceeds to Michigan Heritage Bank. In Defendants' view, however, they did not breach the loan documents by retaining these proceeds, because a representative of the bank was aware of their actions with respect to the Collateral Mortgages in question and purportedly advised Defendants that there was no need to pay these proceeds to the bank so long as they remained "within [the 70-percent] formula" following these mortgage transactions. (*See* Plaintiff's Motion, Ex. F, Seibert Dep. at 37, 49-50.)

7

number of steps to, in its view, protect its collateral and enforce its rights under the loan documents, including (i) filing *lis pendens* and affidavits of interest against properties it believed were included in the pool of Collateral Mortgages,[5] and (ii) notifying mortgagors on the Collateral Mortgages that its designated representative, Towne Mortgage Company, would be servicing their mortgages, and directing them to make their mortgage payments to Towne Mortgage.[6]

Both sides accuse their counterparts of acting in violation of the loan documents during the period leading up to this litigation.  Apart from Defendants' continued failure to pay off their debt, Plaintiff complains that Defendants have continued to collect mortgage and rent payments on certain of the Collateral Mortgages without turning these funds over to Plaintiff to pay down their indebtedness.  Plaintiff further asserts that these

---

[5]Plaintiff has conceded that it erroneously filed *lis pendens* against some properties that were not in the pool of Collateral Mortgages, but it claims that this error was attributable to Defendants' failure to identify the specific mortgages in this pool.  For their part, Defendants have asserted counterclaims of slander of title and tortious interference arising from Plaintiff's erroneous filing of *lis pendens* against properties that were not among the pool of Collateral Mortgages securing the Michigan Heritage Bank loan.  Plaintiff has moved to strike these counterclaims (as well as two other counterclaims asserted by Defendants), and Magistrate Judge R. Steven Whalen has issued a report recommending that Plaintiff's motion be granted.  The Court will address this matter in a separate order following its ruling on Plaintiff's summary judgment motion.

[6]Again, Defendants challenge the propriety of Plaintiff sending these letters to mortgagors.  In one instance, Defendants contend that Plaintiff erroneously sent a letter to a borrower whose mortgage had previously been paid off, resulting in this mortgage being removed from the pool of Collateral Mortgages.  (*See* Defendants' Response, Ex. 11.)  In addition, Defendants point to language in these letters identifying Plaintiff as the "owner" of the mortgages, (*see* Defendants' Response, Exs. 11, 12), an assertion that Defendants view as inconsistent with Plaintiff's position in this litigation that it has merely acted to protect its interest in, rather than seized ownership of, certain of the Collateral Mortgages.

8

funds have been placed in a checking account that it cannot monitor, and to which it has no access.[7]

For their part, Defendants cite a number of actions taken by Plaintiff that they view as tantamount to seizing ownership of the Collateral Mortgages. As discussed in greater detail below, Defendants contend, in essence, that this purported exercise of ownership over the Collateral Mortgages represents an election of remedies, and that Plaintiff therefore is required to take certain required steps — as set forth in the loan documents and mandated under Michigan law — to sell the collateral and use the proceeds to pay down Defendants' indebtedness. In Defendants' view, the value of this collateral is sufficient to satisfy any obligation they may owe under the Note or loan documents. To the extent it is not, Defendants suggest this is due to Plaintiff's failure to deal with the collateral in a commercially reasonable manner, and to actions taken by Plaintiff that have instead diminished the value of the collateral.

As is evident from the foregoing, the parties have diametrically opposed views as to the actions Plaintiff is entitled to take and the remedies it may pursue to secure the outstanding balance of the Michigan Heritage Bank loan to Defendants Watson and BBJ. In light of this impasse, Plaintiff brought the present suit in this Court on January 26, 2010, alleging that Defendants have breached their obligations under the Note and related

---

[7]Shortly after this suit was filed, Plaintiff moved for a preliminary injunction through which, among other things, Defendants would be required to turn over to Plaintiff all payments they had received on properties within the pool of Collateral Mortgages. The Magistrate Judge issued a report recommending that this motion be granted, and the Court recently adopted this report and recommendation and awarded the preliminary injunctive relief sought by Plaintiff.

loan documents, and that Defendants unlawfully converted to their own use the payments on certain Collateral Mortgages and the proceeds they received from the sale or other disposition of other Collateral Mortgages.

### III.  ANALYSIS

**A.    The Standards Governing Plaintiff's Motion**

Through the present motion, Plaintiff seeks summary judgment in its favor on each of the eight claims asserted against Defendants in the first amended complaint.  Under the pertinent Federal Rule, summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c)(2).[8]  As the Supreme Court has explained, "the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986).  In addition, where a moving party — here, Plaintiff — seeks an award of summary judgment in its favor on a claim or issue as to which it bears the burden of proof at trial, this party's "showing must be sufficient for the court to hold that no reasonable

---

[8]Effective December 1, 2010, Rule 56 has been revised in various respects, but the language quoted here (and immediately below) reflects the Rule as it read when Plaintiff filed the present motion.  The recent amendments to Rule 56, even if applied here, would not have any material impact upon the proper disposition of Plaintiff's motion.

trier of fact could find other than for the moving party." *Calderone v. United States,* 799

F.2d 254, 259 (6th Cir. 1986) (internal quotation marks, citation, and emphasis omitted).

In deciding a motion brought under Rule 56, the Court must view the evidence in a

light most favorable to the nonmoving party. *Pack v. Damon Corp.,* 434 F.3d 810, 813

(6th Cir. 2006). Yet, the nonmoving party "may not rely merely on allegations or denials

in its own pleading," but "must — by affidavits or as otherwise provided in [Rule 56] —

set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e)(2).

Moreover, any supporting or opposing affidavits "must be made on personal knowledge,

set out facts that would be admissible in evidence, and show that the affiant is competent

to testify on the matters stated." Fed. R. Civ. P. 56(e)(1). Finally, "the mere existence of

a scintilla of evidence that supports the nonmoving party's claims is insufficient to defeat

summary judgment." *Pack,* 434 F.3d at 814 (alteration, internal quotation marks, and

citation omitted).[9]

---

[9]In their response to Plaintiff's summary judgment motion, Defendants suggest that it would be improper to award summary judgment in Plaintiff's favor because Defendants have been unable to depose the firm selected by Plaintiff to service the Collateral Mortgages, Towne Mortgage Company. Yet, while Defendants have produced some evidence of their effort to subpoena a representative of Towne Mortgage to appear for a deposition, (*see* Defendants' Response, Ex. 23), they never sought relief from the Court for any failure of a Towne Mortgage representative to appear at the designated place and time, nor did they otherwise seek an order compelling Towne Mortgage's compliance with a subpoena to appear for a deposition. Given this lack of effort to enforce their subpoena, it is utterly baseless for Defendants to suggest that they were "not afforded a sufficient opportunity for discovery." (Defendants' Response Br. at 14 (internal quotation marks and citations omitted).)

Moreover, Defendants have not even attempted to invoke the mechanism set forth in Rule 56(f) for opposing a summary judgment motion on the ground that further discovery is needed. *See* Fed. R. Civ. P. 56(f) (mandating that the party opposing a summary judgment

11

**B.      The Defenses Invoked by Defendants to Repayment of the Note Raise Issues of Fact Only as to the Amount Owed, and Do Not Call into Question Defendants' Liability for Breach of the Note.**

In Count I of its first amended complaint, Plaintiff alleges that Defendants Watson and BBJ have breached the promissory note (the "Note") they executed on September 18, 2008 by failing to pay the outstanding balance of the Michigan Heritage Bank loan on or before the maturity date of the Note, September 18, 2009.  In its present motion, Plaintiff seeks summary judgment in its favor on this claim, arguing (i) that there is no dispute as to the facts that the Note became due on September 18, 2009, and that Defendants Watson and BBJ have not paid the outstanding balance of approximately $1.3 million owed as of that date, and (ii) that the defenses asserted by Defendants to their obligation to repay the Note would, at best, raise issues of fact as to the amount of the unpaid balance owed by Defendants under the Note, and not Defendants' liability for breach of the Note.  The Court agrees.

As a threshold matter, Plaintiff states without contradiction that the Note qualifies as a negotiable instrument under § 3-104 of the Uniform Commercial Code ("UCC"),

---

motion must "show[] by affidavit that, for specified reasons, it cannot present facts essential to justify its opposition"); *see also Cacevic v. City of Hazel Park,* 226 F.3d 483, 488 (6th Cir. 2000) (stating that "[t]he importance of complying with Rule 56(f) cannot be overemphasized," and observing that the Rule "has been interpreted as requiring," among other things, a party's explanation as to "why it has not previously discovered the information" identified in the requisite affidavit).  Accordingly, Defendants lack of diligence in pursuing desired discovery does not provide a basis for denying Plaintiff's motion.

Mich. Comp. Laws § 440.3104(1).[10]  This, in turn, triggers the provisions in Article 3 of the UCC that "provide[] an expedited basis for the enforcement of a negotiable instrument."  *National City Bank v. Syatt Realty Group, Inc.,* No. 07-12438, 2010 WL 456814, at *7 (E.D. Mich. Feb. 4, 2010).  In particular, under UCC § 3-308, "[i]n an action with respect to an instrument, the authenticity of, and authority to make, each signature on the instrument is admitted unless specifically denied in the pleadings," and "[i]f the validity of signatures is admitted or proved," a party in possession of the instrument that has the rights of the holder — such as Plaintiff here, which possesses the Note and was assigned the rights of Michigan Heritage Bank, the original holder — "is entitled to payment . . . unless the defendant proves a defense or claim in recoupment." Mich. Comp. Laws § 440.3308(1)-(2); *see also Syatt Realty,* 2010 WL 456814, at *7.  In this case, Defendants McGee and Seibert do not dispute that they signed the Note on behalf of Defendants Watson and BBJ, nor do they deny that they had the authority to do so.  Accordingly, Plaintiff is entitled to the payment called for under the Note — namely, "one payment of all outstanding principal plus all accrued unpaid interest on September 18, 2009," (*see* Plaintiff's Motion, Ex. B, Note at 1) — unless Defendants "prove[] a defense or claim in recoupment."  Mich. Comp. Laws § 440.3308(2).

  In their response to Plaintiff's motion, Defendants appear to advance two such

---

[10]The parties agree that Plaintiff's claims are governed by Michigan law, and a number of the loan documents (including the Note) include provisions stating that they are governed by Michigan law.

defenses to their obligation to repay the Note. First, they evidently appeal to oral

assurances purportedly made by representatives of Michigan Heritage Bank that the Note

would be renewed and its maturity date extended.[11] As Plaintiff points out, however, this

attempted reliance on oral promises runs afoul of at least two separate bodies of Michigan

law. First, Michigan's statute of frauds precludes the enforcement of an oral "agreement

that, by its terms, is not to be performed within 1 year of the making of the agreement."

Mich. Comp. Laws § 566.132(1)(a). According to the testimony of Defendant McGee,

Michigan Heritage representatives assured him at the time these parties entered into the

loan agreement that the Note's one-year maturity date would be extended. (*See* McGee

Dep. at 61-62.) Plainly, then, Defendants seek to rely on a promise of renewal that would

be performed a year or more in the future. Because Defendants concede that this promise

was not memorialized in writing, any such alleged oral agreement to extend the maturity

date of the Note is not enforceable under Michigan's statute of frauds.[12]

_____

[11]The Court notes that while Defendants point to these alleged assurances in the fact
section of their brief in response to Plaintiff's motion, they do not cite these assurances in
support of any argument in opposition to Plaintiff's request for summary judgment on Count I of
the complaint.

[12]Plaintiff also cites a separate provision in the statute of frauds that bars any "action"
against a financial institution resting upon an oral "promise or commitment to renew, extend,
modify, or permit a delay in repayment or performance of a loan, extension of credit, or other
financial accommodation." Mich. Comp. Laws § 566.132(2)(b). Here, of course, Defendants
have not brought an "action" resting upon an oral agreement to extend the maturity date of the
Note, but instead seek to rely upon this oral agreement as a defense to Plaintiff's claim of breach
of the Note. Nonetheless, the Michigan courts have, on at least two occasions, applied this
statute of frauds provision to preclude the defensive use of such an oral agreement. *See, e.g.,
Cadle Company II, Inc. v. P.M. Group, Inc.,* No. 275099, 2007 WL 3119569, at *2 (Mich. Ct.
App. Oct. 25, 2007); *Republic Bank v. Britton Estates, L.L.C.,* No. 258616, 2006 WL 445916, at

In addition, Defendants' reliance on the oral assurances of Michigan Heritage representatives concerning the maturity date of the Note is defeated by provisions in the loan agreement stating that "[t]his Agreement, together with any Related Documents, constitutes the entire understanding and agreement of the parties as to the matters set forth in this Agreement," and that "[n]o alteration of or amendment to this Agreement shall be effective unless given in writing and signed by the party or parties sought to be charged or bound by the alteration or amendment."  (Plaintiff's Motion, Ex. C, Business Loan Agreement at 4.)[13]  The first of these provisions, the agreement's integration clause, precludes the introduction or consideration of extrinsic evidence as to any oral agreements or verbal understandings reached between the bank and Defendants at the time of the agreement that would establish a Note maturity date different from the date set forth in the Note itself — *i.e.,* September 18, 2009.  *See Hamade v. Sunoco, Inc.,* 271 Mich. App. 145, 721 N.W.2d 233, 247-50 (2006); *UAW-GM Human Resource Ctr. v. KSL Recreation Corp.,* 228 Mich. App. 486, 579 N.W.2d 411, 415-19 (1998); *Newburgh/Six Mile Limited Partnership II v. Adlabs Films USA, Inc.,* 724 F. Supp.2d

---

*3 (Mich. Ct. App. Feb. 23, 2006).  The Court need not decide whether to follow these rulings, in light of the other grounds for rejecting Defendants' appeal to oral assurances as a basis for denying summary judgment to Plaintiff.

[13]The term "Related Documents" as used in the agreement's integration clause is defined elsewhere in the agreement as including the Note and "all other instruments, agreements and documents . . . executed in connection with the Loan."  (*Id.* at 6.)

15

740, 754-56 (E.D. Mich. 2010).[14]  The second provision, requiring that any amendments

be in writing, forecloses any attempt by Defendants to establish that they and the bank

reached an oral understanding during the term of the loan agreement that the maturity

date of the Note would be extended, notwithstanding the parties' written agreement to a

one-year term.  *See Quality Products & Concepts Co. v. Nagel Precision, Inc.,* 469 Mich.

362, 666 N.W.2d 251, 258 (2003) (holding that a modification of a contract with a

provision requiring that any amendments be in writing may be established only through

"clear and convincing evidence" that "the parties mutually intended to modify the

*particular* original contract, including its restrictive amendment clauses such as written

modification or anti-waiver clauses").[15]  Accordingly, Defendants have failed as a matter

of law to identify any legally enforceable oral agreement they reached with Michigan

Heritage Bank to extend the September 18, 2009 maturity date expressly set forth in the

---

[14]Although there is a limited exception to this parol evidence rule in the case of fraud relating to the integration clause itself or fraud that would invalidate the contract in its entirety, *see UAW-GM,* 579 N.W.2d at 419; *Newburgh/Six Mile Limited Partnership,* 724 F. Supp.2d at 755-56, Defendants have not claimed or identified any such fraud here in connection with their execution of the loan documents.  In any event, they could not establish the requisite reasonable reliance on any purported oral assurances by Michigan Heritage representatives that varied from the express terms of the loan documents that were placed before them and signed contemporaneously with these alleged assurances.  *See Hamade,* 721 N.W.2d at 249-50; *Newburgh/Six Mile Limited Partnership,* 724 F. Supp.2d at 755-56.

[15]While Defendant McGee refers in an affidavit to continued oral assurances by Michigan Heritage representatives that the one-year term of the Note would be extended, (*see* Defendants' Response, Ex. 21, McGee Aff. at ¶¶ 18, 28), Defendants do not contend that they have produced the requisite "clear and convincing evidence" of the parties' mutual agreement ***both*** to extend the term of the Note ***and*** to modify the provision in the loan agreement requiring that any such extensions be assented to by the bank in writing.

Note.[16]

As their next defense to their obligation to repay the Note, Defendants contend that there is no longer any outstanding balance or indebtedness to pay on this instrument, but that Plaintiff instead has been "paid in full." Yet, while Defendants are quite liberal in repeating this claim of full repayment throughout their brief in response to Plaintiff's motion, they are far less forthcoming with actual evidentiary support for this contention. Generally speaking, however, this claim of repayment appears to rest on two grounds. First, Defendants point to evidence which, in their view, indicates that Plaintiff has taken actions that have impaired the value of the Collateral Mortgages identified as security for the Michigan Heritage loan. This evidence consists of (i) correspondence between

---

[16]Arguably, apart from their effort to establish an oral agreement to extend the maturity date of the Note, Defendants also might be suggesting that Plaintiff should be equitably estopped from seeking to enforce a strict maturity date of September 18, 2009, in light of Michigan Heritage's purported representations that this date would be extended. *See Morales v. Auto-Owners Insurance Co.,* 458 Mich. 288, 582 N.W.2d 776, 779-80 (1998) (discussing the use of principles of estoppel as "an equitable defense that prevents one party to a contract from enforcing a specific provision contained in the contract"). As an aside, while Plaintiff addresses this question in its summary judgment brief as "essentially one of promissory estoppel," (Plaintiff's Motion, Br. in Support at 14), Defendants' attempted defensive use of principles of estoppel is more properly viewed as an appeal to equitable estoppel. *See State Bar of Michigan v. National Union Fire Insurance Co.,* No. 07-12599, 2008 WL 4901108, at *6 n.13 (E.D. Mich. Nov. 10, 2008). In any event, Defendants make no effort in their response brief to develop an argument in support of the defense of equitable estoppel, and the Court declines to craft one on their behalf. Moreover, such an effort almost certainly would not have succeeded, because equitable estoppel is not available where the party invoking it and the party to be estopped had equal access to the true facts. *See Sisk-Rathburn v. Farm Bureau General Insurance Co.,* 279 Mich. App. 425, 760 N.W.2d 878, 881 (2008); *Harvard Drug Group, LLC v. Linehan,* 684 F. Supp.2d 921, 925 (E.D. Mich. 2010); *State Bar,* 2008 WL 4901108, at *7. Surely, as Defendants executed a Note with an explicit maturity date of September 18, 2009 and a related loan agreement with an integration clause, they could not have justifiably relied on purported oral assurances than ran directly counter to these written statements of the terms of the parties' agreement.

mortgage servicer Towne Mortgage and certain mortgagors reflecting modified mortgage payment plans and an apparent agreement to a "short sale" of a property subject to one of the Collateral Mortgages, (*see* Defendants' Response, Exs. 14, 15); (ii) notices to mortgagors of late payments or defaults due to nonpayment, (*see* Defendants' Response, Exs. 16, 17, 18);[17] and (iii) a letter from counsel to mortgagors alerting them that foreclosure proceedings had been or would be commenced based upon allegedly overdue payments, (*see* Defendants' Response, Ex. 19).[18]

This "impairment of collateral" defense, however, suffers from both factual and legal defects. First, upon Defendants' default on their obligation to pay the outstanding loan balance on the Note maturity date of September 18, 2009, Plaintiff was entitled — both under the loan documents, (*see* Plaintiff's Motion, Ex. D, Commercial Security Agreement at 3; Plaintiff's Motion, Ex. H, Warehousing Agreement at § 6.3(i)(d)), and under Article 9 of the UCC, *see* Mich. Comp. Laws § 440.9607(1)(a) — to direct the

---

[17]While Defendants assert that one of these notices was sent despite the fact that the mortgage was "not in default," (Defendants' Response Br. at 9), they offer no evidence for this proposition.

[18]Apart from these materials in the record evidencing Plaintiff's purported impairment of the value of the Collateral Mortgage, Defendants also offer the assertions of their counsel that Plaintiff "may have" violated the federal Real Estate Settlement Procedures Act through its notices to the mortgagors, that it has "confused the borrowers," that its actions generally have "dramatically impaired the value of the collateral," and that "the borrower delinquency rate has significantly increased since Plaintiff became involved" with the Collateral Mortgages. (Defendants' Response Br. at 10-11.) Defendants cite no evidence for these assertions, and it is inappropriate for counsel to make such accusations absent an evidentiary basis for doing so.

mortgagors on the Collateral Mortgages to make their payments to Plaintiff.[19]  This right

to collect the payments on the Collateral Mortgages surely encompasses an entitlement to

take appropriate action against mortgagors who fail to make these payments — and,

again, Article 9 of the UCC confirms this point.  *See* Mich. Comp. Laws § 440.9607(1)(c)

(authorizing a security party to "exercise the rights of the debtor with respect to the

obligation of [a mortgagor] to make payment or otherwise render performance to the

debtor").  Thus, Defendants cannot show that Plaintiff has "impaired" the Collateral

Mortgages merely by producing evidence that it and its agent, Towne Mortgage, have

communicated with mortgagors and threatened further action in the event that mortgage

payments have not been timely made.

To be sure, it is possible — though Defendants have produced scant evidence to

support the proposition — that in taking the actions permitted under the loan documents

and Article 9, Plaintiff has failed in one or more instances to act in the requisite

"commercially reasonable" manner, thereby diminishing the value of the Collateral

Mortgages.  Yet, even if Defendants are able to prove this contention, this would entitle

them only to a setoff against their outstanding indebtedness on the Michigan Heritage

loan.  *See* Mich. Comp. Laws § 440.9625(3)(a); *see also Jones v. Morgan,* 58 Mich. App.

455, 228 N.W.2d 419, 423 (1975); *Wilson Leasing Co. v. Seaway Pharmacal Corp.,* 53

Mich. App. 359, 220 N.W.2d 83, 89 (1974); *Elma, Inc. v. Wolverine Auto Supply, Inc.,*

---

[19]In fact, this Court already reached precisely this conclusion in a March 2, 2011 order
issued earlier in this case.  (*See* 3/2/2011 Order at 3.)

No. 225706, 2001 WL 1699400, at *3 (Mich. Ct. App. Dec. 28, 2001); *Center Capital Corp. v. Marlin Air, Inc.,* No. 07-15128, 2008 WL 937491, at *5-*6 (E.D. Mich. Apr. 7, 2008).[20]   As Plaintiff observes, this question as to the amount of indebtedness owed by Defendants does not preclude an award of summary judgment in Plaintiff's favor as to the liability of Defendants Watson and BBJ for breach of the Note, but rather is an issue of damages that may be addressed and resolved in a subsequent proceeding.[21]

Defendants' second theory of "payment in full" rests upon the premise that Plaintiff has "taken possession, control and ownership" of the Collateral Mortgages, (*see* Defendants' Response Br. at 9), thereby seizing collateral which, in Defendants' view, has more than sufficient value to cover the entirety of Defendants' outstanding indebtedness under the Note.  Again, however, this contention is both factually and legally flawed.  First, as this Court observed in a recent order, "the record fails to bear out Defendants' assertion that Plaintiff 'seized' or 't[ook] ownership' of any mortgages" in the pool of Collateral Mortgages.  (3/2/2011 Order at 2.)  To the extent that Plaintiff has

---

[20]The damages recoverable under § 9-625 of the UCC, Mich. Comp. Laws § 440.9625(3)(a), may be sought through a counterclaim or in an independent action, but Defendants have not pursued either of these courses.  While they have filed counterclaims — which, as noted, are the subject of Plaintiff's pending motion to strike — these counterclaims do not seek damages for Plaintiff's lack of compliance with Article 9.  Rather, such damages are recoverable, at least at present, only as a setoff against Plaintiff's claims.

[21]Under the version of Rule 56 in effect when Plaintiff filed its motion, the Court is expressly authorized to award summary judgment "on liability alone, even if there is a genuine issue on the amount of damages."  Fed. R. Civ. P. 56(d)(2).  The recently amended Rule preserves this authority to grant summary judgment as to only some of the issues raised in a party's motion, with the remaining issues reserved for trial.  *See* Fed. R. Civ. P. 56(g) (effective Dec. 1, 2010).

directed mortgagors to make mortgage payments to its servicing agent, Towne Mortgage, the Court noted above (and in the March 2 order) that Plaintiff has a right under both the loan documents and Article 9 to do so. Moreover, Plaintiff correctly points to the statement in the official comments for UCC § 9-607 that such direction given by a secured creditor to "account debtors" — that is, debtors of the Defendant debtors — is not tantamount to "ownership" of the collateral. *See* Mich. Comp. Laws § 440.9607, Official Comment No. 6. Likewise, Plaintiff's exercise of the rights of Defendants Watson and BBJ in the event of non-payment of or default upon a Collateral Mortgage is authorized under UCC § 9-607, Mich. Comp. Laws § 440.9607(1)(c), and Defendants cite no authority for the proposition that this constitutes "taking ownership" of the collateral.[22] To be sure, Plaintiff's mortgage servicing agent, Towne Mortgage, has stated in letters to mortgagors that Plaintiff was "the owner of your mortgage," (Defendants' Response, Ex. 12), but Defendants fail to suggest a basis for giving these statements legal significance in determining the parties' rights and obligations under Article 9.

In any event, even assuming that the actions taken by Plaintiff could be characterized as "seizing" or taking "ownership" of the collateral, Defendants have failed

---

[22]Indeed, while Defendants assert that Plaintiff has "commenced foreclosure" or actually "foreclos[ed]" on mortgages in the pool of Collateral Mortgages, (*see* Defendants' Response Br. at 9, 16), the only evidence they have produced that would even arguably support these claims is a letter from an attorney to a pair of mortgagors stating that the mortgage servicer, Towne Mortgage, had "referred" the matter to counsel "to foreclose the mortgage." (Defendants' Response, Ex. 19.) There is no evidence in the record that this matter actually proceeded to foreclosure, nor that any of the Collateral Mortgages has been the subject of foreclosure proceedings.

to identify any legal support for their contention that these actions preclude Plaintiff from seeking to enforce the obligations of Defendants Watson and BBJ under the Note. To the extent Defendants refer to certain procedures Plaintiff was obligated to follow and a purported "right of redemption" owed to Defendants before Plaintiff sold the collateral, (*see* Defendants' Response Br. at 14-15), Plaintiff correctly observes that the "strict foreclosure" UCC provisions cited by Defendants in support of this proposition have not been triggered here, where there has been no agreement between Plaintiff and the debtors, Defendants Watson and BBJ, to accept all or any portion of the collateral in full or partial satisfaction of the debt owed by these Defendants. *See* Mich. Comp. Laws § 440.9620 (setting forth the requirements for strict foreclosure, which in turn would give rise to the right of redemption cited by Defendants).

More generally, to the extent Defendants suggest that Plaintiff's actions with respect to the Collateral Mortgages constitute an "election of remedies" that would preclude Plaintiff from seeking a recovery under the Note and instead require that Defendants' debt be satisfied by resort to the collateral, both the UCC and the case law resoundingly defeat this argument. Under UCC § 9-601, a secured party has a right upon default to pursue "1 or more" of a number of remedies, including "reduc[ing] a claim to judgment" and "foreclos[ing], or otherwise enforc[ing]" its security interest, and this same provision emphasizes that these rights "are cumulative and may be exercised simultaneously." Mich. Comp. Laws § 440.9601(1),(3). In accordance with this and other Article 9 provisions, the courts have held that a secured party's exercise of some

22

degree of control over collateral — even if this action is claimed to have resulted in harm to the collateral — does not qualify as an "election of remedies" that would require that the debt be satisfied solely by resort to the collateral. *See, e.g., Jones,* 228 N.W.2d at 423-24; *Wilson Leasing,* 220 N.W.2d at 89; *Michigan National Bank v. Marston,* 29 Mich. App. 99, 185 N.W.2d 47, 50-51 (1970); *Center Capital,* 2008 WL 937491, at *5-*6.

Contrary to Defendants' contention, Plaintiff's exercise of its rights as a secured creditor poses no risk of a "windfall" or "double recovery." Under UCC § 9-615, any proceeds from the disposition of collateral must be applied toward the satisfaction of Defendants' debt, once the reasonable expenses of this disposition are deducted. *See* Mich. Comp. Laws § 440.9615(1). In addition, and as discussed earlier, Defendants would be entitled to a setoff for any harm they have suffered as a result of any violation of Article 9 in Plaintiff's disposition of the collateral. All of these matters, however, implicate only questions as to the amount to be awarded to Plaintiff once Defendants' outstanding indebtedness is determined, any credits are given, and any setoffs are applied, and these issues may readily be addressed in a subsequent proceeding. Certainly, Defendants have not established as a matter of law that their debt to Plaintiff will be altogether extinguished once the appropriate credits and setoffs have been applied — to the contrary, the present record casts considerable doubt on this proposition. Accordingly, because Defendants Watson and BBJ have failed to establish any defense to their liability for breach of the Note, the Court finds that Plaintiff is entitled to summary

23

judgment in its favor as to the liability of these Defendants under Count I of the first amended complaint, with the issue of damages to be resolved in a later proceeding.

**C.     The Individual Defendants and Their Trusts Are Liable for Breach of Their Guaranties.**

In Counts II through V of its first amended complaint, Plaintiff asserts claims that individual Defendants McGee and Seibert, as well as their trusts, have breached guaranties that obligated them to satisfy the indebtedness of Defendants Watson and BBJ under the Note in the event that these two Defendants failed to do so. To establish liability under these guaranties, Plaintiff must show (i) that Defendants McGee and Seibert executed the guaranties at issue, both on their own behalf and as trustees of their respective trusts, and (ii) that the obligation guaranteed has been defaulted upon. *See FDIC v. Hershiser Signature Properties,* 777 F. Supp. 539, 541 (E.D. Mich. 1991); *Bank One, N.A. v. Cullen,* No. 04-72118, 2005 WL 3465722, at *5 (E.D. Mich. Dec. 19, 2005).

There is no issue of material fact as to either of these two elements of Plaintiff's claims. Rather, in opposition to Plaintiff's request for summary judgment on these claims, Defendants merely advance the same defenses addressed above with respect to Plaintiff's claim under the Note — primarily, that Plaintiff has been "paid in full," so that there is no remaining indebtedness to be collected from the guarantors. For the reasons explained earlier, Defendants' contentions as to the amount of their outstanding indebtedness and the possible availability of setoffs raise issues only as to damages, and do not call into question the underlying liability of the guarantors and the makers of the

24

Note.  Accordingly, Plaintiff is entitled to summary judgment in its favor as to the liability of Defendants McGee, Seibert, and their trusts under their guaranties.

**D.    As the Party Bearing the Burden of Proof, Plaintiff Has Failed to Produce Evidence Establishing Its Entitlement to Summary Judgment on Its Remaining Claims.**

In Counts VI and VII of its first amended complaint, Plaintiff alleges that Defendants have breached the Warehousing Agreement and an express trust created under this agreement by collecting mortgage and rent payments on the Collateral Mortgages without turning them over to Plaintiff, and by collecting proceeds from the refinancing of certain of the Collateral Mortgages without turning them over to Plaintiff. Similarly, in Count VIII, Plaintiff has asserted a claim of conversion arising from Defendants' alleged retention of proceeds from the Collateral Mortgages rather than remitting these proceeds to Plaintiff.  As discussed below, the Court finds it unnecessary to address the various legal arguments advanced by the parties in support of or opposition to Plaintiff's request for summary judgment on these claims, because Plaintiff has failed to produce evidentiary support for the allegations upon which these claims are based.

Each of the three remaining counts of Plaintiff's first amended complaint rests upon the same two allegations:  (i) that, following their default on the Note, Defendants collected mortgage and rent payments on the Collateral Mortgages without turning them over to Plaintiff or otherwise using them to pay down their indebtedness;[23] and (ii) that,

---

[23]According to Plaintiff, Defendants have been diverting these payments into a checking account to which Plaintiff has no access.

25

during the course of Defendants' lending relationship with Michigan Heritage Bank, and possibly continuing after their default on the Note, Defendants collected proceeds from the refinancing or other disposition of certain of the Collateral Mortgages without turning these proceeds over to Plaintiff or applying them toward their indebtedness.  As noted earlier, because Plaintiff is the party with the burden of proof as to Counts VI through VIII of the complaint and their supporting facts, Plaintiff is entitled to summary judgment in its favor on these claims only upon a "showing . . . sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party." *Calderone v. United States,* 799 F.2d 254, 259 (6th Cir. 1986) (internal quotation marks, citation, and emphasis omitted).

Plaintiff's present motion fails to provide the requisite evidentiary support to satisfy this standard.  Turning first to Plaintiff's allegation that Defendants collected mortgage and rent payments on the Collateral Mortgages without turning them over to Plaintiff, the record produced by Plaintiff accompanying its motion and initial brief consists of (i) a list, presumably prepared by Plaintiff's counsel, of addresses of properties that are in the pool of Collateral Mortgages and for which Defendants purportedly have collected mortgage payments, (*see* Plaintiff's Motion, Ex. L); and (ii) a letter from Plaintiff's counsel to defense counsel asserting that Defendants have collected mortgage and rental payments on a number of properties in the Collateral Mortgage pool without turning these payments over to Plaintiff, (*see* Plaintiff's Motion, Ex. M).  Plainly, these statements by Plaintiff's counsel are not evidence, nor are they supported by evidence in

26

the summary judgment record, whether the deposition testimony or affidavit of an individual with personal knowledge,[24] or any other sort of document that could itself be admitted into evidence or, at a minimum, contains facts that could be presented in admissible form at trial.  Accordingly, Plaintiff has failed to come forward with evidence from which a trier of fact could conclude that Defendants collected mortgage and rent payments that should have been remitted to Plaintiff.

Plaintiff's allegation of diverted proceeds from the refinancing or other disposition of Collateral Mortgages suffers from the same evidentiary deficiency.  Again, in its initial brief in support of its motion, Plaintiff seeks to prove this allegation principally through the two exhibits addressed (and discounted) above.  In addition — and more promisingly — Plaintiff cites passages from the deposition testimony of Defendants McGee and Seibert as further proof of this allegation.  Yet, this testimony, while presumably made upon personal knowledge, does not bear out the factual proposition Plaintiff seeks to extract from it.

Turning first to the testimony of Defendant Seibert, Plaintiff points to a passage in which he addresses the payoff of one particular Collateral Mortgage, stating that the proceeds from this payoff were not turned over to Michigan Heritage because a bank

---

[24]Later in the brief in support of their motion, Plaintiff cites a passage from Defendant McGee's deposition testimony for the proposition that "Defendants collected proceeds from Collateral Mortgages and deposited them into a private checking account." (Plaintiff's Motion, Br. in Support at 19-20.)  Yet, in the cited passage, McGee makes no mention of any such checking account, nor does he address the collection of mortgage or rental payments derived from Collateral Mortgages.  (*See* Plaintiff's Motion, Ex. A, McGee Dep. at 87-88.)

representative told him this was not necessary so long as Defendants' loan was sufficiently collateralized and Defendants remained "within [their] formula." (Plaintiff's Motion, Ex. F, Seibert Dep. at 49-50.) While Defendants concede that this testimony serves as evidence that they retained the proceeds of the disposition of this specific Collateral Mortgage, rather than using them to pay down their indebtedness, they point to this testimony as *also* evidencing the bank's *waiver* of any contractual right to these proceeds.

As Plaintiff observes in its reply brief, it would be problematic to view the alleged assurance of a Michigan Heritage representative on this single occasion as a "waiver of the entire [Warehousing Agreement]" that would entitle Defendants "to keep the proceeds of all Collateral Mortgages from that point forward." (Plaintiff's Reply Br. at 7.) Such a broad claim of waiver or oral modification seemingly would run afoul of the provisions in the Warehousing Agreement stating that all modifications or waivers were effective only with "the written concurrence of" the bank, that "[a]ny waiver or consent shall be effective only in the specific instance and for the specific purpose for which it was given," and that any failure by the bank to exercise a contractual right in a given instance did not "preclude other or further exercise" of the right at a later date. (Plaintiff's Motion, Ex. H, Warehousing Agreement at §§ 7.10, 7.12.) Yet, for present purposes, Defendant Seibert's testimony need not be read as establishing that the bank (and Plaintiff, as its assignee) forever waived its right to the proceeds of the disposition of any Collateral Mortgage. Rather, Plaintiff need only rely on this testimony for the more limited

28

proposition that Defendants failed to turn over the proceeds of at least one Collateral
Mortgage.  In this very same testimony, however, Defendant Seibert raises an issue of
fact as to whether the bank agreed to waive any obligation Defendants might otherwise
have owed to devote these particular proceeds to repayment of the loan.  Consequently,
this testimony would not compel a reasonable trier of fact to accept Plaintiff's assertion
that, at least in one instance, Defendants breached an obligation to turn over any proceeds
they obtained from the disposition of any Collateral Mortgages.

Plaintiff fares no better in its attempted reliance on the deposition testimony of
Defendant McGee.  In the passage cited by Plaintiff, McGee testified about the general
practice he followed upon the disposition of a Collateral Mortgage.  Specifically, McGee
stated that in each such instance, he would contact a representative of Michigan Heritage,
who in turn would compare the existing state of the collateral against the parties' agreed-
upon formula.  (*See* Plaintiff's Motion, Ex. A, McGee Dep. at 87-88.)  If the bank
representative determined that the loan remained sufficiently collateralized, he would
advise McGee that there was "no requirement for us to pay" the proceeds toward the loan.
(*Id.* at 88.)

Again, there is no need for the Court to resolve the parties' debate about whether
this testimony could support Defendants' contention that Michigan Heritage once and
forever waived any contractual requirement for Defendant to turn over the proceeds of
Collateral Mortgages.  Rather, it is enough, for present purposes, to observe that McGee's
testimony falls short of establishing as a matter of law that, in at least one identifiable

29

instance, Defendants failed to comply with their obligation to contribute these proceeds toward the repayment of their debt.  To the contrary, McGee's testimony does not address any specific instance of the disposition of a particular Collateral Mortgage, but instead refers in general to Michigan Heritage's practice of evaluating each such disposition in isolation and determining on a case-by-case basis whether Defendants should retain or turn over the proceeds.  Moreover, to the extent that this testimony could be read as implicitly acknowledging that, on at least some occasions, Defendants did not turn over these proceeds, McGee's testimony (like Seibert's) indicates that the bank waived its right to these proceeds in each such instance.   This testimony, then, does not aid Plaintiff's effort to establish a breach of the Warehousing Agreement or an express trust arising from this agreement, nor does it establish a wrongful conversion of funds belonging to Plaintiff.

In light of these deficiencies in Plaintiff's evidentiary showing in support of the claims asserted in Counts VI through VIII of their first amended complaint, the Court need not address the legal issues raised by the parties regarding the proper construction and enforceability of the Warehousing Agreement, and regarding a possible waiver of the terms of this agreement.  Rather, because Plaintiff has failed to produce evidentiary support for the allegations giving rise to these claims, the Court finds that Plaintiff is not entitled to summary judgment in its favor on these claims.

## IV.  CONCLUSION

For the reasons set forth above,

30

NOW, THEREFORE, IT IS HEREBY ORDERED that Plaintiff's July 30, 2010

motion for summary judgment (docket #50) is GRANTED IN PART and DENIED IN

PART, in accordance with the rulings in this opinion and order.


s/Gerald E. Rosen
Chief Judge, United States District Court

Dated:  March 28, 2011

I hereby certify that a copy of the foregoing document was served upon counsel of record
on March 28, 2011, by electronic and/or ordinary mail.

s/Ruth A. Gunther
Case Manager